UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVSION

**J.P.,** a minor by and through Guardian Ad Litem, **CRYSTAL P.** and **DANIEL P.**, individually and on behalf of a class of all similarly situated students; **ANDREA V.**, individually and on behalf of a class of all similarly situated parents; **ESTHER V.**, individually and on behalf of a class of all similarly situated teachers; **SYLVIA U.**, individually and on behalf of a class of all similarly situated school support staff; **Z.R.,** a minor by and through Guardian Ad Litem, **CORINA R.**, individually; **J.S.,** a minor by and through Guardian Ad Litem, **JENNIFER C.**, individually; **I.R.,** a minor by and through Guardian Ad Litem, **ALMA R. and GEORGE R.**, individually; **L.R.,** a minor by and through Guardian Ad Litem, **LUCIENE A.** and **FRANK R.**, individually; **Z.A.,** a minor by and through Guardian Ad Litem, **ESTHER V.**; **M.C.,** a minor by a through Guardian Ad Litem, **JASMINE C.** individually; **M.T.,** a minor by and through Guardian Ad Litem **LOUANNA R.**; **B.G.** and **F.G.**, minors by and through Guardian Ad Litem, **BEATRICE T.**, individually; **J.L.,** a minor by and through Guardian Ad Litem, **ASHLEY L.,** individually; **J.D**., a minor by and through Guardian Ad Litem, **SANDRA V.,** individually; **F.L.,** a minor by and through Guardian Ad Litem, **VIRGINIA G.**, individually**; A.P.,** a minor by and through Guardian Ad Litem, **ARACELY P. and ROMAN P.**, individually; **A.L.,** a minor by and through Guardian Ad Litem, **CRYSTAL G.**, individually; **D.J.Q.** a minor by and through Guardian Ad Litem, **YVETTE Q.** and **MANUEL Q.**, individually; **J.P**., a minor by and through Guardian Ad Litem, **JASMIN P.**, individually; **T.G.,** a minor by and through Guardian Ad Litem, **JACKIE G.**, individually; **R.F.,** a minor by and through Guardian Ad Litem, **MONICA O.**, individually; **A.V.** and **G.E.**, minors by and through Guardian Ad Litem, **ANDREA V.**, individually; **N.S.**, a minor by and through Guardian Ad Litem, **ALIETA P.**, individually and grandmother,

Civil Action No.:  1:22-cv-01252

## COMPLAINT FOR DAMAGES

## CLASS/ MASS ACTION

### Jury Demand

**MARIA P.**, individually; **A.L.A.T**., a minor by and through Guardian Ad Litem, **CASSANDRA B.**, individually; **G.D.G.R.,** a minor by and through Guardian Ad Litem, **CYNTHIA R.**, individually; **J.M.**, a minor by and through Guardian Ad Litem, **SANDRA M.** and **MARTIN M.**, individually; **MARIA G.-R.** individually**; VANESSA G.**, individually, and **DOES 1-3000**, individually

        *Plaintiffs,*

vs.

**THE UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT ("UCISD"); UCISD SCHOOL PRINCIPAL MANDY GUTIERREZ; UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT POLICE DEPARTMENT ("UCISD-PD") CHIEF PEDRO ARRENDONDO; UCISD-PD OFFICER ADRIAN GONZALEZ; UCISD-PD OFFICER JESUS "J.J." SUAREZ; CITY OF UVALDE; UVALDE POLICE DEPARTMENT ("UPD") LIEUTENANT MARIANO PARGAS; UPD SERGEANT EDUARDO CANALES; UPD LIEUTENANT JAVIER MARTINEZ; UPD SERGEANT DANIEL CORONADO; UPD OFFICER LOUIS LANDRY; UPD OFFICER DONALD PAGE; UPD OFFICER JUSTIN MENDOZA; TEXAS DEPARTMENT OF PUBLIC SAFETY ("TDPS") REGIONAL DIRECTOR VICTOR ESCALON; TDPS DIRECTOR STEVEN MCGRAW; CAPTAIN JOEL BETANCOURT; TDPS SERGEANT JUAN MALDONADO**, and **DOES 1-600**,

        *Defendants.*

***La Gente Unida Jamás Será Vencida***
"The People United Will Never Be Defeated"

## CLASS/MASS ACTION COMPLAINT

Plaintiffs, individually and on behalf of all other similarly situated students, student parents and/or guardians, teachers, and school support staff who were in attendance, or had children in attendance, at Defendant Uvalde Consolidated Independent School District's ("CISD") Robb Elementary School ("Robb Elementary") on May 24, 2022, **and who have sustained emotional and psychological damages as a result of Defendants' conduct and omissions on that date[1]**(collectively, "Putative Class members") by and through undersigned counsel, hereby file this Class/Mass Action Complaint, based on Plaintiffs' personal knowledge and upon information and belief as to Plaintiffs and the Class, against Defendants' City of Uvalde, et al., and allege as follows:

## NATURE OF THE ACTION

1.      Regrettably, this court must preside over yet another recurring and deeply tragic occurrence where once again, elementary age children and their dedicated teachers had been murdered and emotionally maimed by a deeply troubled young man wielding a semi-automatic machine gun who, in his delusion colored by glorification of violence perpetuated by both video games and targeted gun manufacturer advertisements, mercilessly released his own childhood trauma and pain upon unsuspecting beautiful and buoyant young children and teachers at school.

2.      This iteration of this now all too frequent tragedy, took place on May 24, 2022 at the Robb Elementary school, in Uvalde, Texas. Uvalde Texas is a close knit, rural community

---

[1] The Putative Class **does not** include those parties and their families who had been shot and/or had been killed on May 24, 2022 at Robb Elementary School.

located 80 miles from the United States and Mexican border. Robb Elementary School is a school administered by Defendant Uvalde Consolidated Independent School District ("CISD").

3.      In administering the schools under its control, CISD employed its own police department ("CISD-PD"). Not only had CISD-PD undertaken a state sponsored and mandated active shooter response training, but that CISD had additionally promulgated its own required protocols and standards to employ in the event of an active shooter on one of its campuses. Despite such preparedness, the CISD police department, along with similarly trained law enforcement agencies including the City of Uvalde's police department ("UPD"), the Texas' Department of Public Safety("DPS"), San Antonio Police Department's SWAT unit, Uvalde's Sheriff's office, and the United States Department of Homeland Security("Border Patrol" & "BORTAC"), fundamentally strayed from conducting themselves in conformity with what they knew to be the well-established protocols and standards for responding to an active shooter.

4.      Thus, on account of such abject failure by such highly trained law enforcements agencies, Plaintiffs and the putative Class members will now be forced to endure the indelible and forever-lasting trauma that Defendants immeasurably caused and amplified on account of their contemptible and flagrant affirmative conduct in failing to undertake prescribed courses of action. Plaintiffs and Class members respectfully request that this Court does its part in providing the framework for redressing the harms that no amount of money nor forgiveness can ever absolve.

## JURISDICTION AND VENUE

5.      This case is brought under 42 U.S.C. § 1983 and under state law. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court additionally has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure

authorizes this Court to grant injunctive relief, as well as the authority to award costs and attorneys' fees under 42 U.S.C. §§ 1988 and 3613(c)(2).

6.      Venue is proper within the Western District of Texas, Austin Division, under 28 U.S.C. § 1391(b)(1) and (2) because at least one Defendant resides within this district. Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

### Plaintiffs

7.      **Plaintiff Student Class Representative J.P.** is a minor student who was ten years old when he was in attendance at Robb Elementary on May 24, 2022. **J.P.**'s parents, Plaintiffs **Daniel and Crystal P.** are suing Defendants on **J.P.**'s behalf. Plaintiff **J.P.** is also suing Defendants on behalf of the class of students who were on the premises of Robb Elementary on May 24, 2022 and who sustained emotional and psychological damages as a result of Defendants' conduct and omissions on that date. **J.P.** and his parents, Plaintiffs' **Daniel P.** and **Crystal P.** are the parents and legal guardians of J.P., who, as a family, reside in Uvalde, Texas.

8.      **Plaintiff Parent Class Representative**, **Andrea V.**, is a parent of minor, **A.V.** and **G.E.** is suing Defendants on behalf of herself, **A.V.** and the putative class of parents of children who were in attendance at Robb Elementary on May 24, 2022. Plaintiffs **A.V.** and her sister **G.E.** were nine years old in fourth grade and seven years old in third grade respectively on May 24, 2022 while in attendance at Robb Elementary. **A.V.** was in lockdown in Room 105 while **G.E.** was on recess in the playground at the time of the shooting. Plaintiff **Andrea V.** is the parent and legal guardian of **A.V.** and **G.E.,** who, as a family, reside in Uvalde, Texas.

9.     **Plaintiff Teacher Class Representative, Esther V.** was in attendance at Robb Elementary on May 24, 2022 serving as a teacher's assistant in Room 31 and 32 and is a resident of Uvalde, Texas. Ms. V. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022. **Ms. V.** is a resident of Uvalde, Texas.

10.    **Plaintiff Support Staff Class Representative Sylvia U.** was driving schoolbus number 19 on May 24, 20222 serving an employee of the School District as a Bus Driver and is a resident of Uvalde, Texas. Ms. V. is suing Defendants on behalf of herself, and the putative class of teachers employed by CISD who were on the premises of Robb Elementary on May 24, 2022.

11.    Plaintiff **Z.R.** was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 109 at Robb Elementary. Plaintiff **Corina R.** is the parent and legal guardian of Z.R., who, as a family, reside in Uvalde, Texas.

12.    Plaintiff **J.S.** was eight years old in third grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiff **Jennifer C.** is the parent and legal guardian of J.S., who, as a family, reside in Uvalde, Texas.

**13.**    Plaintiff, **M.C.,** a minor who was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 103 at Robb Elementary. Plaintiff **Jasmine C.** is the parent and legal guardian of M.C., who, as a family, reside in Del Rio, Texas.

14.    Plaintiff **I.R.** was eight years old in second grade on May 24, 2022 when he was in attendance in Room 19 at Robb Elementary. Plaintiffs **George** and **Alma R.** are the parents and legal guardians of I.R. who, as a family, reside in Uvalde, Texas.

15.     Plaintiff **L.R.** was nine years old in third grade on May 24, 2022 when she was in attendance and at the cafeteria at Robb Elementary. Plaintiffs **Frank R.** and **Luciene A.** the parents and legal guardians of L.R. who, as a family reside in Uvalde, Texas.

16.     Plaintiff **Z.A.** was nine years old in third grade on May 24, 2022 when he was in attendance in room 2 at Robb Elementary. Plaintiff **Esther V.** is the parent and legal guardian of Z.A. and on May 24, 2022 was working at Robb Elementary as a teacher's assistant and was in lockdown in Room 31 and 32 during the seventy-seven minute stand-off at Robb Elementary. Both Z.A. and his mother, Ms. V. reside in Uvalde, Texas.

17.     Plaintiff **M.T** was nine years old in third grade on May 24, 2022 when she was in attendance in room 1 at Robb Elementary. Plaintiff **Louanna R.** is the parent and legal guardian of M.T and as family, reside in Uvalde, Texas.

18.     Plaintiffs **B.G**. and brother **F.G.** were eight years old in third grade and seven years old respectively on May 24, 2022 when they both were in attendance on recess outside on the playground at Robb Elementary when the shooting commenced on the campus. Plaintiff **Beatrice T.** is the parent and legal guardian of both B.G. and F.G and together, as a famly, reside in Uvalde, Texas.

19.     Plaintiff **J.L**. was seven years old in third grade on May 24, 2022 when she was in attendance at Robb Elementary outside on the playground at the time of the shooting commenced on campus. Plaintiff **Ashley L.** is the parent and legal guardian of J.L. and together as a family, reside in Uvalde, Texas.

20.     Plaintiff **J.D.** was ten years old in fourth grade on May 24, 2022 when he was in attendance in Room 109 at Robb Elementary. Plaintiff **Sandra V.** is the parent and legal guardian of J.D. who, as a family, reside in Uvalde, Texas.

21.     Plaintiff **F.L.** was seven years old in third grade on May 24, 2022 when she was in attendance at Robb Elementary and hiding on the cafeteria's stage during the shooting. Plaintiff **Virginia G.** is the parent and legal guardian of F.L. who, as a family, reside in Uvalde, Texas.

22.     Plaintiff **A.P.** was eight years old and in third grade on May 24, 2022 when he was in attendance at Robb Elementary. Plaintiffs **Roman P.** and **Aracely P.** are the parents and legal guardians of A.P. who, as a family, reside in Uvalde, Texas.

23.     Plaintiff **A.L.** was eight years old in third grade on May 24, 2022 when he was in attendance in Room 5 or 6 at Robb Elementary. Plaintiff **Crystal G.** is the parent and legal guardian of A.L., who, as a family, reside in Uvalde, Texas.

24.     Plaintiff **D.J.Q.** was eight years old in third grade on May 24, 2022 when in attendance outside on the school grounds near his classroom, Room 8. Plaintiffs **Manuel** and **Yvette Q.** are the parents and legal guardians of D.J.Q, who, as a family, reside in Uvalde, Texas.

25.     Plaintiffs **J.P.** was seven years old and in second grade on May 24, 2022 when in attendance in Room 17 at Robb Elementary. Plaintiff **Jasmin P.** is the parent and legal guardian of J.P. who, as a family, reside in Uvalde, Texas.

26.     Plaintiffs **T.G.** was eight years old and in second grade on May 24, 2022 and was in attendance in Room 18 at Robb Elementary. Plaintiff **Jackie G.** is the parent and legal guardian of T.G. who, as a family reside in Uvalde, Texas.

27.     Plaintiffs **R.F.** was nine years old and in fourth grade on May 24, 2022 when in attendance at Robb Elementary. Plaintiff **Monica O.** is the parent and legal guardian of R.F., who, as a family, reside in Uvalde, Texas.

28.     Plaintiffs **N.S.** was nine years old and in third grade on May 24, 2022 when in attendance in Room 12 at Robb Elementary. Plaintiffs **Alieta P.** is the parent and legal guardian of N.S. and **Maria P**. is the grandmother of N.S., who, as a family, reside in Uvalde, Texas.

29.     Plaintiffs **A.L.A.T** was ten years old and in fourth grade on May 24, 2022 while in attendance in Room 302 at Robb Elementary. Plaintiffs **Cassandra B.** is the parent and legal guardian of A.L.A.T, who, as a family, reside in Uvalde, Texas.

30.     Plaintiff **G.D.G.R.** was seven years old and in third grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiff **Cynthia R.** is the parent and legal guardian of G.D.G.R, who, as a family reside in Uvalde, Texas.

31.     Plaintiff **J.M.** was nine years old and in fourth grade on May 24, 2022 while in attendance at Robb Elementary. Plaintiffs **Sandra M.** and **Martin M.** are the parents and legal guardians of J.M. who, along with J.M. reside in Uvalde, Texas.

32.     Plaintiff **Maria G.-R.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Ms. Maria G.-R. resides in Uvalde, Texas.

33.     Plaintiff **Vanessa G.** was a bus driver for CISD on May 24, 2022 while on location at Robb Elementary. Ms. Vanessa G. resides in Uvalde, Texas.

## Defendants

34.     The **Uvalde Consolidated Independent School District** ("School District" & "UCISD") is a public school district in Uvalde, Texas. Robb Elementary is a school administered by UCISD. The School District was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, and campuses within its jurisdiction, including Robb Elementary. At all relevant times, UCISD was charged by law with the administration and operation of the school district, including employment, control, supervision,

discipline, training and practices of all school district and UCISD personnel and employees, and with the formulation of its policies, practices, and customs. In addition, UCISD is responsible for ensuring that the personnel of the school district obeyed the laws of the United States and the State of Texas. The School District acted or failed to act, at all relevant times, through its employees, agents, and/or chief policymakers, and is liable for such actions and/or failure to act.

35.    The **Uvalde Consolidated Independent School District Police Department** ("UCISD-PD") is an agency of the School District. The School District is charged by law with the administration and operation of UCISD-PD, including the employment, control, supervision, discipline, training, and practices of UCISD-PD's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of UCISD-PD. The School District and UCISD-PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

36.    The **Texas Department of Public Safety** ("TDPS") is an agency of the State of Texas. The State of Texas is charged by law with the administration and operation of TDPS, including the employment, control, supervision, discipline, training, and practices of TDPS's personnel and employees, and with the formulation of its policies, practices, and customs. The School District is legally responsible for the acts and omissions of TDPS. The State of Texas and TDPS's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

37.    Defendant **Pedro Arredondo** ("Chief Arredondo") is an individual residing in Uvalde, Texas. At all relevant times, Chief Arredondo was a council member of the City of Uvalde and the Chief of Police for the UCISD-PD. Chief Arredondo as the chief and final policymaker

for the School District and UCISD-PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Chief Arredondo was acting within the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Arrendondo is being sued in both his individual and official capacities.

38.     Defendant **Mandy Gutierrez** is an individual residing in Uvalde, Texas. At all relevant times, Mandy Gutierrez ("Principal Gutierrez") was the Principal at Robb Elementary School. Principal Gutierrez was an official policymaker for the School District and the official policymaker for Robb Elementary School. Principal Gutierrez acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Principal Gutierrez was acting within the scope of her employment, under color of state law, and in her individual and official capacities Principal Gutierrez is sued in both her individual and official capacities.

39.     Defendant **Adrian Gonzalez** is an individual residing in Texas. At all relevant times, Gonzalez was a police officer with the UCISD-PD. Gonzalez, as a police officer with the UCSID-PD, had acted in the scope of his employment and under color of state law, and on account of his actions and omissions, is liable to Plaintiffs. Defendant Gonzalez is being sued in his individual capacity.

40.     Defendant **Jesus "J.J." Suarez** is an individual residing in Texas. At all relevant times, Suarez was a UCISD Board member and, upon information and belief, a reserve officer for the UCISD-PD. Suarez, as a police officer of the UCSID-PD, had acted in the scope of his employment and under color of state law, and on account of his actions and omissions, is liable to Plaintiffs. Defendant Suarez is being sued in his individual capacity.

41.     The **City of Uvalde** ("Uvalde") is a municipality organized under the laws of the state of Texas. The **Uvalde Police Department** ("Uvalde PD") is an agency of Uvalde. Uvalde is charged by law with the administration and operation of the Uvalde PD, including the employment, control, supervision, discipline, training, and practices of Uvalde PD's personnel and employees, and with the formulation of its policies, practices, and customs. Uvalde is legally responsible for the acts and omissions of the Uvalde PD. Uvalde and Uvalde PD's policies, practices, and/or customs were moving forces in causing the constitutional violations of Plaintiffs and Plaintiffs' resulting damages.

42.     Defendant **Mariano Pargas** is an individual residing in Uvalde, Texas. At all relevant times, Mariano Pargas (or "Lt. Pargas") was a Lieutenant with the Uvalde PD. In Uvalde PD Chief's absence, Lt. Pargas was the acting Chief of Uvalde PD during the unprecedented law enforcement response to the active shooter at Robb Elementary. At all relevant times, Lt. Pargas was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Lt. Pargas, as the chief and final policymaker for Uvalde PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. Lt. Pargas is being sued in his official and individual capacities.

43.     Defendant **Javier Martinez** is an individual residing in Texas. At all relevant times, Martinez was a lieutenant of the UPD. Martinez, as a lieutenant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Martinez was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Martinez is being sued in his individual capacity.

11

44.     Defendant **Eduardo Canales** is an individual residing in Texas. At all relevant times, Canales was a sergeant of the UPD. As a sergeant of the UPD acted, Sgt. Canales acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Canales was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Sgt. Canales is sued in his individual capacity.

45.     Defendant **Daniel Coronado** is an individual residing in Texas. At all relevant times, Coronado was a sergeant of the UPD. As a sergeant of the UPD acted, Sgt. Coronado acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Coronado was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Sgt. Coronado is sued in his individual capacity.

46.     Defendant **Louis Landry** is an individual residing in Texas. At all relevant times, Landry was an officer with the UPD. Landry, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Landry was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Landry is sued in his individual capacity.

47.     Defendant **Donald Page** is an individual residing in Texas. At all relevant times, Page was an officer with the UPD. Page, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Page was acting in the scope of his

employment, under color of state law, and in his individual and official capacities. Defendant Page is being sued in his individual capacity.

48.     Defendant **Justin Mendoza** is an individual residing in Texas. At all relevant times, Page was an officer of the UPD. Mendoza, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Mendoza was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Defendant Mendoza is sued in his individual capacity

49.     Defendant **Victor Escalon** is an individual residing in Waslaco, Texas. At all relevant times, Victor Escalon ("Director Escalon") was South Texas Regional Director of the Texas Department of Public Safety ("DPS") and was acting Director of DPS on the scene during the calamitous attack on Robb Elementary. Director Escalon acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. At all relevant times, Director Escalon was acting within the scope of his employment, under color of state law, and in his individual and official capacities. Director Escalon is being sued in his official and individual capacities.

**50.**     Defendant **Steve McGraw** is an individual residing in Austin, Texas. At all relevant times, Steve McGraw ("Director McGraw") was the Regional Director of the Texas Department of Public Safety ("DPS") and was the Chief Director of DPS during the tragic attack on Robb Elementary. Director McGraw acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs and Class members under Federal and state law. At all relevant times, Director McGraw was acting within the scope of his employment, under color of state law,

and in his individual and official capacities. Director McGraw is being sued in his official and individual capacities.

51.     Defendant **Joel Betancourt** is an individual residing in Texas. At all relevant times, Betancourt was a captain of the TDPS. Betancourt, as a captain of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Betancourt was acting in the scope of his employment, under color of state law, and in his official and individual capacies. Defendant Betancourt is being sued in his individual capacity.

52.     Defendant **Juan Maldonado** is an individual residing in Texas. At all relevant times, Maldonado was a sergeant of the TDPS. Maldonado, as a sergeant of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Sgt. Maldonado was acting in the scope of his employment, under color of state law, and in his official and individual capacity. Defendant Maldonado is being sued in his individual capacity.

53.     Plaintiffs are ignorant of the true names and capacities of defendants sued herein as **Does 1-100**, inclusive, and therefore sue these individuals by such fictitious names. Some of the Does 1-100 were responsible for the training, supervision, control, assignment and discipline of the sworn and civilian personnel of UCISD and the City of Uvalde, as well as UCISD-PD, UPD, DPS and other local, state and federal law enforcement, including the U.S. Department of Homeland Security who responded to Robb Elementary on May 24, 2022.  Plaintiffs will give notice of this complaint, and of one or more Does' true names and capacities when ascertained. Plaintiffs are informed and believe and based thereon allege, that Defendant Does 1-100 are responsible in some manner for the damages and injuries hereinafter complained of.

14

## PRELIMINARY ALLEGATIONS

54.     Given the exponential rise in mass shootings in the United States and their gut-wrenching encroachment into school settings,[2] school districts and law enforcement have been forced to reckon with this national scourge while having their efforts thwarted by callous and unrelenting Second Amendment advocates and opportunistic, profit driven gun manufactures.

55.     Such reckoning has resulted in the aggregation of standards of care and protocols that provide school districts and law enforcement with predetermined and vetted courses of action that enable them to undertake a swift, automatic, and highly organized response whose utmost adherence can save lives within fractions of a second.

56.     Nevertheless, protocols and standards are only effective if and when their dictates and tenets are complied with. Despite the fact that such protocols and standards pertaining to mass school shootings were well in place as of May 24, 2022, the Uvalde school district, as well as local, state and federal law enforcement were woefully in breach of these well-established protocols when in fact their implementation was gut-wrenchingly triggered. Instead of swiftly implementing an organized and concerted response to an active school shooter who had breached the otherwise 'secured' school buildings at Robb Elementary school, the conduct of the three hundred and seventy-six (376)[3] law enforcement officials who were on hand for the exhaustively torturous

---

[2] Mass shootings have doubled in the past four years. In 2018 there were 336 mass shootings, 417 in 2019, 610 in 2020, and 691 in 2021. See, https://www.gunviolencearchive.org/past-tolls; see also, https://everytownresearch.org/maps/mass-shootings-in-america. The National Center for Education Statistics, a research arm of the U.S. Department of Education, reported a total of 93 school shootings with casualties at public and private elementary and secondary schools during the 2020/2021 school year. Only eleven such shooting occurred in 2009. https://nces.ed.gov/whatsnew/press_releases/06_28_2022.asp

[3] Three hundred and seventy-six law enforcement officers responded to the tragedy at Robb Elementary School. The breakdown of responders, by agency, is as follows: (149) United States Border Patrol, (91) Texas Department of Public Safety, (25) Uvalde Police Department, (16) San Antonio Police Department (SWAT), (16) Uvalde County Sheriff 's Office, (14) U.S. Department

seventy- seven minutes of law enforcement indecision, dysfunction, and harm, fell exceedingly short of their duty bound standards.

57.     As with the largest contingent of law enforcement on the scene at Robb Elementary School on May 24, 2022, the Texas Department of Public Safety("DPS"), the entirety of Texas law enforcement departments subscribed, trained, and were thereby bound by the protocols provided by the Advanced Law Enforcement Rapid Response Training program.[4] ALERTT, a program created in response to the Columbine school shooting in 1999, and considered the national standard in active shooter response training, provides Texas law enforcement with standardized training for responding to active mass shootings.

58.     Primarily, the ALERTT protocol requires that responders must have tools and training to 'immediately' and without delay, make entry and neutralize an active shooter. Thus, when a subject fires a weapon at a school he remains an active shooter until he is neutralized and is not to be treated as a "barricaded subject." ALERTT training lucidly distinguishes between a hostage/barricade and active shooter scenarios. Relatedly, under the ALERTT protocol, law enforcement's first priority is to immediately stem the killing of innocent civilians and that every law enforcement officer is expected to be willing to risk his or her life without hesitation. Hence, law enforcement officers are expected to **distract, isolate, and neutralize** the threat, even in

---

of Homeland Security, (13) United States Marshals 8 Drug Enforcement Agency, (7) Frio County Sheriff 's Office, (5) Kinney County Sheriff 's Office, (5) Uvalde Consolidated Independent School District, (4) Dilley Police Department, (4) Zavala County Sheriff 's Office, (3) Medina County Sheriff 's Office, (3) Sabinal Police Department, (2) City of Uvalde Fire Marshals, (2) Pearsall Police Department, (2) Texas Parks and Wildlife, (2) Uvalde County Constables, (2) Val Verde County Sheriff 's Office, (1) Frio County Constables, and (1) Southwest Texas Junior College and (1) Zavala County Constables.

[4] See generally https://alerrt.org/about ("The ALERRT Center at Texas State University was created in 2002 as a partnership between Texas State University, the San Marcos, Texas Police Department and the Hays County, Texas Sheriff 's Office to address the need for active shooter response training for first responders.").

tactically complex situations. As such ALERTT mandates that "from that moment forward, every law enforcement officer is expected to be willing to risk his or her life without hesitation." Such overriding mandate exists to stem the ensuing damage by swiftly moving to neutralize the shooter. Time is of the essence as the longer the shooter is active, the more carnage accrues.

59.      In order to establish a coordinated effort to effectuate the overriding mandate of swift neutralization, the ALERTT protocol requires the prompt establishment of an Incident Command structure. Incident Command will be established by the first law enforcement responder who arrives on the scene and is charged with immediately providing dispatch with a brief LCAN (i.e. Location, Condition, Actions, and Needs). Thereafter, the responder assumes immediate command. Further, "as soon as a law enforcement responder notices that there appears to be sufficient officers hunting for the shooter, that responder should find a secure location, take out their Active Shooter Response Card, assume Initial Incident Command, and begin completing tasks listed on the card."[5] Thereafter, the incident commander disseminates vital information, i.e., location, condition, actions and needs, to all the subsequently arriving law enforcement and emergency services who arrive at the scene. The ALERTT protocol stresses that the earlier an incident command structure is established, the more prompt and successful response can be achieved.

60.      Thereafter, once an active shooter situation grows larger, both temporally and in complexity, the 'first responder' who initially assumed the incident command position must pass on the command position to an officer of a higher rank or level **and/or department with more**

---

[5] ALERRT training teaches that every law enforcement responder, "even those recently hired, should carry the Active Shooter Response Card with them at all times," and "they should be prepared to assume command and start completing the tasks listed on the card within the first few minutes."

**widespread jurisdiction**. Thereafter, incident command should move off premises where an overall commander will take charge and assume control over the unfolding chaos of the emergency.

61.     With respect to accessing closed or locked entryways or exits, ALERTT protocol is clear and mandates that "responders should be creative and make use of improvised tools to get inside the building **however they can**." With respect to using keys to gain entry, ALERRT counsels that "the quickest, most discreet, and safest method of entering a locked building is to locate a key—**as long as keys can be located immediately**," but "if a key cannot be located quickly, [law enforcement] responders should use another technique to enter the area without delay." ALERTT suggests sledgehammers and pry tools as reliable, practical, and affordable breaching tools.

62.     Although all Defendant law enforcement agencies subscribed to the ALERTT protocols and standards, Defendant Uvalde Consolidated Independent School District ("CISD") additionally adopted its own standards and protocols set out in a register entitled, "ANNEX 1 Active Shooter," April 15, 2020. ("Annex"). The Annex I was adopted upon direction from the State of Texas mandating that every school officer in Texas must be trained on how to respond to an active shooter.

63.     The CISD Annex outlined the operational concepts, responsibilities, and procedures required in order to coordinate the response to an active shooter by the CISD's administration, teachers, District police officers, and local law enforcement. As with the AERTT protocols, the Annex program stressed the importance of neutralizing the shooter as the number one priority. The "Priority of Life Scale" dictates that innocent civilians are prioritized over law enforcement and other responders.

64.     Thus, the Annex mandated that the CISD police, administrators and teachers have "the daily responsibility to mitigate and prevent an active shooter situation," including '**conducting inspections of classrooms to make sure doors and windows can be secured…doors to all classrooms remain locked during instruction…and that each staff member will know the procedures to follow in order to have any door or window repaired that will not lock.**" In addition, the Annex 1 circumscribed policies in order to diminish the risk of an active shooter occurrence. For example, the Annex required each CISD campus to convene a team to identify, evaluate and address potential threats to school security, including the monitoring of all social media that suggests a connection to Uvalde in order to identify any possible threats made against students and/or staff within the school district. **Perimeter fencing is required to restrict access to Robb elementary, as is staff emergency training, procurement of radios to staff to support campus communications.**

65.     The CISD Annex **designates the District's police department's chief as the officer responsible for coordinating the efforts of all law enforcement and first responders who arrive on the scene**, and that the District's administration office should be utilized as the incident command post and should contain the school's emergency systems that include communications, staff and student's locations, and detailed floor plans that are readily available for use in coordinating the response. The Annex stressed that all incoming outside law enforcement and first responders should follow the direction of the District's police chief and accept their assigned roles.

## STATEMENT OF FACTS

### A.  Pre May 24, 2022 Attack

#### 1.  Safety Compliance at Robb Elementary

19

66.     Prior to the May 24, 2022 attack, compliance with safety protocols and physical conditions at Robb Elementary school were more than deficient. For example, the school's five-foot tall exterior fence was negligible for impeding a would be intruder. Both Defendant Robb Elementary Principal Gutierrez and CISD Chief of Police Arrendondo were well aware of this 'achilles heel' in the school's safety infrastructure but failed to make affirmative steps to remediate its significant shortcoming in protecting against would-be intruders.

67.     While the school's safety policies mandated that both the school's external and internal doors were to be consistently locked, there existed a culture of noncompliance by school personnel who perpetually and deliberately circumvented the required locking of the doors by consistently propping them open. The school's administrators, including Principal Gutierrez and Chief Arredondo, as well as the CISD school board, were all well aware of such policy breaches but rather then address them, they chose instead to permit their continuation. Similarly, despite being apprised that the doors to many of its classrooms, including the ill-fated Rooms 111 and 112, were unable to properly lock, the Principal Gutierrez and Chief Arredondo failed to ensure that such locks were repaired.

68.     Principal Gutierrez, Chief Arredondo and the CISD school board were additionally apprised that Robb Elementary's emergency warning system was significantly compromised on account of perpetually poor internet coverage and mobile phone service. Such paltry service also negatively impacted CISD's police radios whose connectivity was consistently challenged.

69.     On account of Uvalde's proximity to the Mexican border, there were frequent instances of Mexican human traffickers crossing the U.S. border while being pursued by U.S. Border patrol. The traffickers would purposefully crash their vehicles in order to permit their smuggled patrons to scatter. In response, the administrators and police at Robb Elementary would

sound an alarm via its Raptor alert system and either designate a 'secure' alert or a 'lockdown' alert. The frequency with which these 'bailout' secure or lockdown alerts took place, i.e., 50 lockdown alarms between February and May 2022, lead the school staff to disregard the warnings and to treat the alarms as matter of fact and of little concern.

70.     Rather than creating different alarm signals for different types of emergencies, the administration relied upon only one signal whose frequent use, on account of 50 'bailout' lockdowns in three months, significantly diminished the urgency of response. When coupled with poor internet and cell phone reception, the school administrators and police department were well aware that the school's emergency response system for campus lockdowns was patently inadequate.

### 2.  Salvador Ramos

71.     The eighteen-year old Uvalde resident, Salvador Ramos ("Ramos") significantly fit the profile of other school shooters. His home life and upbringing were riddled with trauma that lead him down a path of alienation and withdrawal which was further met with bullying and ridicule. It is not a coincidence that Ramos intentionally targeted fourth grade students as he himself was the subject of protracted bullying in his fourth grade year. Thereafter, Ramos withdrew from attending classes such that by 2021, at age seventeen, he had only completed ninth grade.

72.     After withdrawing from school, Ramos spiraled down a dark path with his friends taunting him as a "school shooter." Alienated, Ramos found himself indulging in first person shooter video games, including Call of Duty and Grand Theft Auto. Ramos found the attention he was seeking on social media by depicting himself as a cold hearted, violent and aggressive character who displayed dead animals and play-acted a rageful gun shooter wearing body armor.

Relatedly, Ramos hinted on social media that he intended to engage in a school shooting and that he welcomed attention and notoriety

73.     Although seventeen in 2021, Ramos attempted to effectuate "straw" gun purchases and began to amass gun accessories including body carrier armor. Simultaneous with his purchases, Ramos began to increase vocalizing his obsession with school shootings. Upon his eighteenth birthday on May 16, 2022, Ramos immediately purchased a Daniel Defense DDM4 V7 (an AR-15 style rifle) that he had shipped to the Oasis Outback gun store in Uvalde. One day later, Ramos purchased another rifle, a Smith and Wesson M&P15, as well as 1,740 rounds of ammunition which again he picked up at Oasis Outback. A background check was conducted and despite Ramos making multiple gun purchases within a short period of time which were otherwise reported to the Bureau of Alcohol, Tobacco and Firearms ("ATF"), Ramos passed his background checks.

## B.  May 24, 2022 Robb Elementary School Shooting

### 1.  Attacker's Arrival at the School

74.     On May 24, 2022, Robb Elementary was poised to celebrate the end of the 2022 school year with an awards ceremony for its students and parents. Believing that this would also be the day that his classmates from Uvalde High would reconvene at Robb Elementary as a traditional parting gesture before graduation, Ramos planned to attend and carry out his intended massacre. On that fateful morning, after a heated exchange with his grandmother over a mobile phone plan, Ramos shot his grandmother and set off in her truck towards Robb Elementary school.

75.     On route to Robb Elementary, on or about 11:28 a.m., Ramos, who apparently did not know how to drive, lost control of the truck which landed in a canal ditch. As the crash occurred in the vicinity of the Hillcrest Memorial Funeral Home, two employees walked over to be of

assistance. Ascending from the crash, Ramos began shooting at the two Hillcrest employees who fled for their lives back to the funeral home.

76.     Gathering his arsenal, Ramos proceeded to Robb Elementary which was adjacent to where he crashed his grandmother's truck. Ramos easily traversed the school's five-foot perimeter fence which turned out to be a negligible deterrent to would-be intruders.

77.     Ramos was spotted by Coach Yvette Silva who was outside with her third graders. Ramos proceeded to shoot in the direction of Coach Silva who took cover and immediately reported an active shooter through her school radio at approximately 11:29 a.m. Expecting to immediately hear an overhead announcement that the campus was being placed in lockdown, Coach Silva shepherded her students from the playground into lockdown position. The lockdown announcement that Coach Silva had expected to imminently circulate failed to occur.

78.     **Teacher Class Representative Esther V.** ("Ms. Esther V.") also heard the rattle of Ramos's gunshot from her special education classroom, Rooms 31-32. After hearing the gunshots, Ms. Esther V., a full time UCISD special education teacher with students ranging from 2nd through 4th grade, proceeded to the window and saw students and teachers scattering in all directions. Ms. Esther V. promptly locked the classroom's doors and shuttled her emotionally and physically disabled students into a closet within the classroom. After everyone was was accounted for, there were approximately thirteen students and teachers barricaded within the closet. Some of her special needs students understood what was happening and expressed their fear and confusion. Ms. Esther V. texted her nine year old child's teacher to apprise her of the shooter and to determine if her child was safe and under her supervision. Ms. Esther V. received a text back from her child's teacher informing that she was not with the class as they were in the cafeteria having lunch.

79. As a special needs teacher, Ms. Esther V. was equipped with a school radio and heard Coach Silva announce the presence of Ramos but did not hear a campus wide announcement and/or a warning on the Raptor system.

**2. Failed Active Shooter Warning**

80. Such communication failure unfolded on account that the School's Raptor application system failed to transmit because of the well acknowledged and persistently bad Wi-Fi signal on the campus. Although impeded from broadcasting the active shooter alert through Wi-Fi, Principal Gutierrez did not attempt to communicate lockdown over the campuses' intercom. She did however call Chief Arredondo who commanded her to "shut it down Mandy, shut it down." She thereafter instructed the school's head custodian to ensure that all the doors were locked.

81. Thus, the lockdown was communicated amongst the school's faculty by word of mouth. Many of the teachers who were exiting the buildings with their students either heard Coach Silva screaming or saw students running and in turn, directed their students to run for cover. One such teacher, Elsa Avila ushered her students into room 109 where on account of yet another faulty door lock, was required to forcefully slam the classroom's door in order to engage its lock. She and her students then assumed the lockdown positions away from the windows and doors.

**3. Arrival of Law Enforcement**

82. Meanwhile, the Uvalde Police Department dispatched the initial 911 report from the funeral home. Commander of Uvalde Police Dept. SWAT team, Sgt. Eduardo Canales ("Sgt. Canales") and Uvalde Police acting Chief Mariano Pargas set off to Robb Elementary. Upon arrival, said officer met UPD officers Javier Martinez and Louis Landry who were also on the scene. Sgt. Canales saw Ramos shooting his AR-15. There were other Uvalde Police officers present, as well as Department of Public Safety ("DPS") Sergeant Juan Maldonando. At 11:33

a.m., Uvalde Police officers observed Ramos carrying a rifle outside the school's west hall entryway. The officer asked his supervisor, Sgt. Daniel Coronado for permission to shoot the suspect. In waiting for a response, it was too late as Ramos had already moved out from his site as the officer turned to shoot at Ramos.

83.     Although otherwise required under the ALERTT protocol to immediately encounter and attempt to neutralize Ramos, neither of these first responding Uvalde Police officers undertook such action nor did they set up an Initial Incident Command in order to begin the coordination of an active shooter response. Thus, the Uvalde PD first responders failed and refused to undertake the required protocol to immediately "distract, isolate, and neutralize the shooter." Under the ALERTT protocol, they were not required to await an order to swiftly confront an active shooter. Nevertheless, Uvalde's police officer first responders chose to disregard that imperative mandatory protocol.

### 4. Arrival of CISD Police Chief Arredondo

84.     Soon thereafter, Uvalde CISD Police Chief Arredondo arrived having left his office at Uvalde High School. Despite knowing that he was responding to an active shooter incident, Chief Arredondo failed to bring along his body armor or rifle. Even more curious, Arredondo, upon alighting from his squad car, discarded his police radio. Such decision precluded his ability to perform his role of incident commander who was required to set up a communication command center. Thus, at the outset, Chief Arredondo disregarded his prescribed duties under both the CISD Annex and ALERTT protocols for responding to active shooters on CISD property.

### 5. Attacker Enters the School

85.     Meanwhile, Ramos walked along the west side of the west building and then entered the unlocked northwest door. Although Ramos entered the west door, the exterior doors

on both the east and south sides of the building were also unlocked such that Ramos had unfettered access to the building's interior.

86.     Once inside the west building, Ramos walked down the hallway and stopped in front of Rooms 111 and 112. At approximately 11:33 a.m., Ramos fired his AR-15 rifle towards Rooms 111 and 112. Thereafter, Ramos entered the door to Room 111 which, as was the case on prior occasions and which the school administration had been duly apprised, was extremely difficult to lock and as such, was unfortunately unlocked and unsecured.

87.     Once inside Room 111, Ramos rapidly fired over 100 rounds, both inside the room and the adjoining room 112. After two and a half minutes, many students and two teachers were murdered.[6] Many had died instantaneously while others died slowly. Ramos apparently had no prior experience with firearms and it was likely that the shooting on May 24, 2022 was the first time he fired a weapon. Terrified teachers and students throughout the west building had heard this extended burst of gunfire, as did several law enforcement responders as they entered the building through the unlocked south and west doors.

**6. Law Enforcement Enters the School**

88.     In hearing the gunshots, Uvalde PD Sgt. Canales turned to Defendant Department of Public Safety Sgt. Maldonando, who had arrived on the scene moments before at 11:34, stated "we gotta get in there," to which Sgt. Maldonando replied, "DPS is sending people." Canales responded saying, "He keeps shooting. We gotta get in there."

89.     In less than three minutes after the shooting began, Defendants Canales, Martinez, Landry, and Acting Chief Pargas of the UPD approached Rooms 111 and 112. The officers,

---

[6] Teachers Irma Garcia and Eva Mireles were killed during Ramos's indiscriminate two and half minute eruption of the AR-15's military grade capacity to automatically deliver repeated and continuous gunfire. Ms. Mireles was located in the adjourning Room 109.

outfitted with body armor, two rifles and three pistols, took up positions near the classrooms. They heard the shots being fired in the classrooms, as well as shots erupting through the walls.

90.     Several of those bullets that had careened through the walls and entered Room 109 which was immediately adjacent to Room 111 and 112 in which Ramos was located.

91.     **Class Student Representative, Plaintiff J.P.** was in Room 109 when one of those bullets struck his beloved fourth grade teacher, Elsa Avila in the abdomen. Her students, including J.P. were horrified but encouraged her teacher to hold on. Another of the bullets struck J.P.'s friend and sheared off a section of her nose. As J.P. and his classmates were hunched down in lockdown position, J.P. and his classmates were torturously forced to endure the horror alone in their minds and bodies while listening to the crying, wailing and grimacing of students in their own room as well as through the walls into the carnage of Room 111. Having experienced bullets piercing through the walls and knowing that more could be arriving at any second, each subsequent minute of lockdown was an eternal hell for J.P. and his classmates.

92.     After the two-and-a-half minute shooting spree with sporadic gun shots thereafter, Chief Arredondo, at approximately 11:36 a.m., along with Uvalde PD Sergeant Coronado, Officer Page, and Gonzalez entered the south side of the building. Again, Chief Arredondo, in disregarding the first principal of rapidly moving to neutralize the shooter, determined that it was best to leave his radios behind despite the fact that under CISD Annex active shooter protocol, Chief Arredondo was required to assume the position of incident commander to ensure a coordinated response. Nevertheless, upon information and belief, no such incident command had been enabled prior to Chief Arredondo's arrival and/or entry into the south side of the building.

93.     Although Defendants Lt. Martinez and Sgt. Canales had prepared to breach the doors, the officers were refrained from doing so after shots were fired in their direction. Soon

thereafter, approximately 8 or 10 law enforcement, including Uvalde PD Acting Chief Pargas, gathered in or around the vicinity of Rooms 111 and 112. Acting Chief Pargas imparted the command to Uvalde PD officers to stand down and not to confront Ramos. UPD Sgt. Coronado informed other officers that the suspect was "contained" and "barricaded," which the officers understood to mean that they were confronting a non-active shooter situation. Such was a blatant misrepresentation as moments before, Ramos had been actively firing his weapon. Defendant officers knew or had reason to know that they were confronting an active shooter situation and not a barricaded subject situation. Sgt. Coronado knew this to be the case but nevertheless erroneously designated the situation as a non-active shooter scenario. When inside the building, the officers attempted to communicate on their radios but were unsuccessful on account of limited reception. Without the existence of an incident command nor an incident commander (Chief Arredondo was amongst the officers positioned in or near Rooms 111 and 112), no one had yet to set up an incident command. This absence included Acting Chief Pargas who, despite perceiving a vacuum in an overall incident command, refrained from assuming that role.

94.     In or about 11:41 a.m., officers from the PDS arrived including TDPS Fire Marshall Hernandez, Constable Johnny Field and Constable Emmanuel Zamora who were instructors at the regional police academy. Additionally, CISD-PD J.J. Suarez, who was also as UCISD Board member arrived and entered the building.

## C. Seventy-Seven Minutes

### 1. Chief Arredondo Orders Officers to Stand Down and Questions Whether Facing Active Shooter Scenario.

95.     After Ramos fired upon the officers positioned outside of Room 111 and 112, Chief Arredondo gave the order to those of his command nearby to stand down and not to engage Ramos. Thereafter, Chief Arredondo considered whether there were any students in Room 110. Finding

the room's door unlocked, Chief Arredondo discovered an empty classroom and somehow jumped to the conclusion that by not seeing any injured students or teachers, that the 'active shooter' scenario had changed to that of a 'barricaded subject' scenario, i.e., that Ramos was isolated and alone in the classroom and as such, the strategy was to rescue the children in the adjacent classrooms and wait out Ramos and then neutralize him.

96.     This theory unfortunately proved to be false throughout the course of the seventy three minutes, particularly when a series of 911 calls[7] were received from terrified students who were huddled in agony in Room 111 and 112 confirming that the active shooter scenario was torturously unfolding.

97.     Meanwhile, Robb Elementary disingenuously announces on Facebook that the school is under lockdown status "due to gunshots in the area" but nevertheless "the students and staff are safe in the building. The building is secure in a Lockdown status." At the same time, the Uvalde PD posts on Facebook that there exists a "large police presence at Robb Elementary. We ask the public to avoid the area."

### 2. Chief Arredondo Accepts Active Shooter Scenario and is Unaware of Law Enforcement Responses in Other Parts of the Building

98.     Chief Arredondo used his cellphone to call Uvalde PD's dispatch and inquire whether a teacher was with Ramos in Room 111. Thereafter, Chief Arredondo admitted that he believed that there were either students and a teacher inside the room with Ramos and that there

---

[7] At approximately 12:03, a young female student called 911 and over several calls over thirteen minutes, informed officials that multiple students had been shot and killed and that there were only eight to nine students still alive. At approximately 12:19 p.m., another 911 call was placed by a different student in an adjourning classroom. The student hung up upon the insistence of another student. A subsequent call was received where 911 heard the sound of three gunshots. At approximately 12:36 p.m., the initial young female student called 911 and informed dispatch that "he shot the door," and "please send the police now."

was a strong likelihood of casualties as well. Chief Arredondo repeated this same understanding such that he repudiated his hunch that Ramos was a barricaded subject.

99.    Uvalde Police Sgt. Coronado exited the building to make a call to dispatch (rather than to the non-existent incident command center whose required existence went thoroughly ignored) requesting ballistic shields, flashbang grenades and helicopter support. Sgt. Coronado admitted that he was unsure as to whether the door to either Room 111 or Room 112 was unlocked and reaffirmed that Ramos was contained and barricaded within Room 111. Sgt. Coronado remained outside the building for approximately 30 minutes while students and teachers were being evacuated through punched-out windows on the west side of the building.

100.    While not located on the west side of the building, **Teacher Class Representative Velasquez** and her special needs and physical and emotionally disabled students were escorted out of her classroom's closet. Law enforcement were pressuring her to move quickly despite her student's special needs conditions which otherwise impeded such a rapid response. Ms. Velasquez lifted up her smallest student and explained to her other students that they needed to run and/or move quickly. Ms. Velasquez, clutching her student in her arms, ran across campus to the safe haven of the funeral home.

101.    Ms. Velasquez immediately texted her husband, who, after being mistaken as a first responder, had been helping to evacuate other students across campus. She also sought information as to her son who was in lockdown in the school's cafeteria.

102.    During the entirety of this time, Chief Arredondo remained inside the building and according to Sgt. Coronado, was "in charge" of the response despite not having the capacity to receive dispatches and communications. For example, both Chief Arredondo and Sgt. Coronado were unaware that the U.S. Border Patrol Tactical Unit ("BORTAC") were assembling and

operating at the opposite side of the building from where both the Chief and the Sergeant were located.

103.     At approximately 11:44 a.m., Ramos started shooting again providing further proof that Ramos was an active shooter. No officer responded, including the police academy instructors, Constables Field and Zamora nor Officers Hernandez, Suarez or Mendoza. Rather, the assembled officers saw fit to search for a negotiator and bullhorn to negotiate with Ramos as if he was a barricaded subject rather than an active shooter.

### 3.   Chief Arredondo Searches for a Master Key

104.     Despite being unaware as to whether the door to Rooms 111 and 112 were indeed locked, Chief Arredondo determinatively sought a master key when, as Chief of the CISD police force, the procurement of such master key should have been accomplished in short order. Nevertheless, Arredondo stressed that before any attempt to enter the classroom could occur, he needed a master key and breaching tools. Despite awaiting the arrival of what Arredondo conceived to be the only means of entering the classroom and neutralizing the shooter, there was no incident command in place such that Arredondo could have been informed when these two 'necessary' instruments had arrived on the scene.

### 4.   Law Enforcement Response on North Side of the Building

105.     While Chief Arredondo was orchestrating his response from the south side of the West building, an entirely separate response was being undertaken on the north side of the building. On this north side, officers from the Uvalde PD, including acting chief Lt. Pargas, Lt. Martinez and Sgt. Canales were stationed awaiting some command response. Acting Chief Pargas acknowledged that he was never in communication with Chief Arredondo nor with the other law enforcement officers on the north side of the building. It was Lt. Pargas' understanding that

Arredondo must have been coordinating the law enforcement response given his supervisory jurisdiction over the school. According to Lt. Pargas, the Uvalde PD was merely there to provide support. As such, Lt. Pargas did not assert Uvalde PD's jurisdictional authority over Chief Arredondo and the CISD-PD to set up a command center nor did he seek to coordinate with any of the other agencies that were responding. Rather, Lt. Pargas was awaiting the arrival of the Department of Public Safety or BORTAC who he assumed would be providing better equipment.

### 5. DPS Texas Rangers Ordered to Stand Down

106.    However, when the DPS Texas Rangers did arrive, law enforcement at the perimeter, who were unaware of what was happening inside the building instructed them to merely assist with the perimeter. Such instruction was reaffirmed by DPS commanding officer Captain Joel Betancourt who directed his DPS team to remain on the perimeter and to not enter the building. Betancourt ordered the DPS team to "stand by" and await the arrival of a more highly-skilled group who were on the way. Captain Betancourt also ordered a DPS team that was gearing up and poised to breach the classroom to stand by. Captain Betancourt's order resulted in the large contingent of DPS personnel on site to disregard their training and refrain from taking immediate and swift action to neutralize the shooter. Such command resulted in the majority of the ninety-one strong DPS units to wait more than seventy minutes into the seventy-seven minute long shooting to take any substantive action.

107.    Upon information and belief, Captain Betancourt was carrying out both DPS Regional Director Victor Escalon and DPS overall Director Steve McGraw's directives as to how DPS should engage while responding to an active shooter at Robb Elementary school despite the state mandated and required protocols that they were required to undertake.

32

108.    However, DPS Special Agent Luke Williams ignored such instruction and proceeded over to the north side of the building and began clearing the students and teachers along the north hallway. When interfacing with officers stationed outside Rooms 111 and 112, DPS Agent Williams was informed that they were waiting for instruction from "whoever was in charge figuring things out."  After discerning that law enforcement's response was seemingly unfolding in a haphazard manner and without a centralized command, DPS Agent Williams was required to follow the ALERTT protocol by asserting his authority as a DPS Texas ranger and take the reins in setting up a command center and tightening up the response. However, DPS Agent Williams, as well as the other 91 DPS law enforcement personnel on the scene, failed to take charge despite their mandate and jurisdictional authority to do so.

### 6.  Law Enforcement Blocks Plaintiff Parents Entry From Retrieving their Children

109.    Meanwhile, at the perimeter of the school's campus, many parents had assembled seeking to retrieve their children. They were vehemently denied entry onto the campus by law enforcement despite having received no affirmative communication apprising them of the state of law enforcement's response to neutralizing the active shooter. Approximately twenty or so minutes after Ramos had entered the building, a group of terrified parents pleaded with law enforcement to permit their entry which was forcefully rebuffed. The student's parents were forcefully held back, pinned to the ground, pepper sprayed and tasered. One parent however was able to break through the grip of law enforcement who were preventing her entry. She ran into the building and rescued her two children.

110.    In or about this same time frame, the word got out that there was an ensuing active shooter at Robb Elementary. **Parent Class Representative Andrea Vela** ("Ms. Vela") received a call from her sister informing her that such nightmare was unfolding. Ms. Vela's son and

granddaughter were in attendance at school on that day. A.V. was in fourth grade and G.E. was in third grade. At first, Ms. Vela didn't believe her sister as there was nothing posted on the school's Facebook page which in the past, the school was sure to communicate. Panicking, Ms. Vela drove in the direction of the school and after passing the school's street, drove towards the back of the school near the funeral home.

111.   At the funeral home, several parents and law enforcement were assembled. Ms. Vela was determined to find her son but was thwarted by law enforcement. A woman was gathering the names of students from their parents and promised to determine whether they were safe. Ms. Vela provided her children's names. Other parents were banging on the doors and windows looking for answers as to their children's safety. When the woman with the list returned and wasn't able to confirm A.V.'s presence, Ms. Avila panicked.

112.   Ms. Vela forcefully screamed and cried, panicking that A.V. had been murdered. In pressing to determine if her son was alive, Ms. Vela was able to receive word that A.V. was alive inside the school. After hearing that the school was going to load the children onto school buses and bring them to the Civic Center, Ms. Vela left for the Civic Center to see for her own eyes that A.V. was safe and sound. After lining up at the Civic Center, Ms. Vela was finally reunited with her son A.V. A.V.'s teacher told Ms. Vela how proud she was of A.V.'s bravery and how strong he was during the experience.

### 7.   Homeland Security BORTAC Prepare to Breach Classroom and Neutralize Attacker

113.   As events unfolded inside the building, unbeknownst to Lt. Pargas, Homeland Security's BORTAC unit, under the command of Paul Guerrero, had been assembling and were themselves awaiting an order to breach the classroom. Cmd. Guerrero was well informed that students were trapped in the classroom with Ramos. Nevertheless, Cmd. Guerrero informed his

officers that it was "going to take time" to breach the door. Between the time period of 11:37 a.m. and 12:50 p.m., surveillance footage depicted a steady stream of law enforcement agencies moving in and out of the north hallway, purportedly positioning and preparing themselves for the eventual 'breaching effort.'

114.    Despite the fact that Chief Arredondo and Uvalde P.D.'s acting Chief Pargas were awaiting the arrival of ballistic shields in order to effectuate the breach of Room 111, surveillance video taken between the hours of 11:52 a.m. and 12:21 p.m. depicted the arrival of four different ballistic shields to the north end of the building. A rifle-rated shield arrived at around 12:20 p.m. some thirty minutes before the classroom was finally breached. However, Chief Arredondo, who was located at the south end of the building and was operating without the assistance of a centralized command center, was unaware that the shields, particularly the rifle-grade shield had arrived. Similarly, Chief Arredondo was also unaware that BORTAC had assumed operational control at approximately 12:20 p.m.

115.    On or about 12:15 p.m., a student from inside the building called and reported that her teacher, Ms. Mireles, was alive but had been shot. Ms. Mireles was the wife of Uvalde PD officer Ruben Ruiz who received a call from his wife at 11:48 a.m. confirming that she had been shot. This 911 call followed an earlier call at 12:03 p.m. wherein a student called informing 911 dispatch that there were eight to nine students still alive in her classroom. In or about the same time, Defendant Officers, including acting Chief Pargas received a radio dispatch that one of the classrooms was "full of victims."[8] Acting Chief Pargas responded, "ok, ok, thanks" and after informing Border Patrol as to the victims, stepped out of the school building for thirty minutes.

---

[8] Lt. Pargas was well apprised that along with the shooter, there were a classroom of children and a teacher in Room 111 and 112. See, https://www.cnn.com/2022/11/14/us/uvalde-investigation-acting-police-chief-mariano-pargas

35

Despite that such information reinforced the fact that the officers were facing an active shooter scenario, Defendant officers persisted in responding as if it were a 'barricaded subject" scenario. Such response continued despite officers hearing that Ramos began firing his weapon in Room 111 at 12:21 p.m., some 37 minutes after the last shooting had occurred.

116.    Just before 12:30 p.m., on the north side of the hall, a group of officers established a position closer to Rooms 111 and 112, as well as staged medical triage equipment on the east side of the hall. This took place under the tactical command of BORTAC. BORTAC's acting commander Paul Guerrero arrived at the north side with a breaching tool and again, without coordinated communication, Chief Arredondo was unaware that BORTAC was poised to breach Rooms 111 and 112.

117.    In taking control of the situation, Commander Guerrero determined that the use of the Halligan breaching tool would not work fast enough such that his officers would face a heightened risk of gunfire. Similarly, in acquiring and testing a master key on an adjacent classroom door, Cdr. Guerrero determined that the master key that he received from the school did not work. Although there was reasonable doubt as to whether the door to Room 111 was locked, Cdr. Guerrero obtained a second master key which he determined had worked. Nevertheless, despite having all the elements in place to breach the classroom and in taking charge of the tactical command inside the building, Cdr. Guerrero waited to give the order for his team to move forward.

**8.  BORTAC Breaches Room 111 and Kills Attacker**

118.    Finally, after assembling a stack of BORTAC officers, as well as charging one officer with holding the rifle-rated ballistic shield, Cdr. Guerrero commanded the students through the door, "Yell if you need help," and after Ramos shot the responding student, opened the door to Room 111 where Ramos fired his rifle at the stack. The stack killed Ramos with a barrage of

bullets. Although such undertaking unfolded in a matter of seconds and was otherwise the required response under the standards and protocols for responding to an active shooter, law enforcement took seventy-seven minutes to accomplish what they were duty bound to expeditiously perform. Each second of those seventy-three minutes exponentially compounded Plaintiffs and class members harms to a degree that it is indelibly etched into the hearts and souls of the survivors, their families, and the Uvalde community at large.

### 9. Evacuation of Children and Staff

119.    After receiving a dispatch at approximately 11:40 a.m., **Support Staff Class Representative Sylvia U.,** upon arriving at the funeral home with her school bus, found a chaotic and crazed scenario with parents screaming, law enforcement scurrying to and fro, an awaiting ambulance, and an impossibility to maneuver her large bus through the chaos. Prior to arriving at the funeral home, Ms. Sylvia U. was not informed what was happening at Robb. Dispatch merely informed her to pick up children at Robb and take them to Uvalde High School.

120.    It was only upon her arrival at the funeral home did she learn what was tragically unfolding. Panicked and unable to drive forward or backward, Ms. Sylvia U. locked her bus and awaited instruction from law enforcement. Sometime around 12:50 p.m., Ms. Sylvia U. heard a barrage of gunshots. Minutes thereafter, BORTAC officers, with bloodied children in their arms, came storming onto her bus with six profusely bleeding children.
The officers set the children in the back of the school bus.

121.    Realizing that three of the six children were in a more critical state, BORTAC retrieved the three and carried them out to an ambulance. The three remaining children were also profusely bleeding with the BORTAC officer commanding Ms. Sylvia U. to quickly drive to the hospital. As the bus was blocked from going forward, law enforcement had to move vehicles and

clear the traumatized and panicking parents to allow the bus to depart.   A police car escorted both the ambulance and Ms. Sylvia U.'s bus to the hospital. Upon driving out, Ms. Sylvia U. witnessed the bodies of the deceased children being lined upon the sidewalk, as well as EMS applying CPR in an attempt to save the life of one of the teachers.

122.    After finally arriving to the hospital and delivering the traumatized and bleeding children, Ms. Sylvia U. drove back in the direction of Robb Elementary with the BORTAC officer. She was then ordered to return to Robb Elementary to pick up children and deliver them to Uvalde's Civic Center. However, as her bus was covered in blood, both on the seats and throughout the entirety of the floors, Ms. Sylvia U. drove back to bus garage to pick up another bus.

123.    Upon arriving back to Robb Elementary, Ms. Sylvia U. witnessed a chaotic mass of teachers with their traumatized and screaming children and parents being held back by law enforcement. As the children were being loaded onto the bus, Ms. Sylvia U. saw many of the children that she regularly transported to school. The children were screaming and crying all the way to the Civic Center. Upon arriving at the Civic Center, Ms. Sylvia U. witnessed parents clamoring to locate their children but were kept from reuniting with them by law enforcement until after the children entered the building. Parents were then requested to show proof that they were indeed their children's rightful parents.

124.    After dropping off the children at the Civic Center, Ms. Sylvia U. was required to return to Robb and pick up the remaining children. She did so and after making that last run to the Civic Center, Ms. Sylvia U. returned the bus to the bus garage, finally allowing herself to break down and express the horror that she had just experienced.

125.    Although Ms. Sylvia U. had been a bus driver for the Defendant UCISD for several years, the CISD had never provided training on the proper measures to take when executing school evacuations, let alone evacuations on account of active shooter scenarios.

**D.  <u>Post Attack</u>**

**1.  Law Enforcement Fails to Follow Required State Protocols for Responding to Active Shooter**

126.    The narrated facts above glaringly expose law enforcements complete and utter disregard of the standards and protocols required when responding to an active shooter scenario. In total, three hundred and seventy-six law enforcement were on hand and not one complied with the absolutely mandatory requirement that they immediately distract, isolate and neutralize the active shooter. Reports compiled post-attack indicated that despite the state mandated requirement that all law enforcement in the state of Texas undergo active shooter training, only 50% of the UPD officers who had responded on May 24, 2022 had received training. In addition, Defendant officers failed to establish an incident command. Each law enforcement agency who arrived ignored the all too apparent reality that they were confronting an active shooter scenario and that there was no coordinated, centralized command in place to orchestrate the response, let alone any centralized communication center informing and coordinating the various agencies of the overall tactical plan.

127.    In addition, the response was so completely ineffectual that after Ramos was neutralized and students were liberated from the classrooms, the students, including those wounded were evacuated to the hospital on a regular school bus rather than the required ambulances. The school buses were without EMT's or other adults aboard so when the bus arrived at the hospital, those children who had been wounded had to limp off the bus without assistance.

### 2. Texas SPD Fails to Assert Command Authority Despite Chaotic and Disorganized Response

128.    As law enforcement officers with the primary state law enforcement agency, the ninety plus SPD Texas Rangers on the scene were imbued with jurisdictional authority over the situation yet permitted the organizational void to persist over an unconscionable seventy-seven minute delay. Although there was a vague assumption that the Chief of the CISD police, Chief Arredondo had assumed command, the fact that Arredondo had positioned himself within the south side of the building and was therefore out of contact with the response efforts assembling on the north side, as well as those on the perimeter, such assumption was clearly unreasonable.

129.    This is particularly so given that the responding agencies had all undergone both the state mandated ALERTT active shooter training, as well as their own individual agency trainings and thus, were well aware of the protocols and command chains that were required. It was glaringly clear to all law enforcement agencies that such protocols were not in place and functioning at Robb Elementary school throughout that fateful seventy-seven minutes of protracted confusion and unimaginable physical and emotional suffering endured by the students, teachers and parents.

### 3. A Communications Vacuum Perpetuated the Disorganized Response

130.    Similarly, as the primary required response was to "stop the killing," the entirety of law enforcement never attempted to breach the classroom nor take affirmative steps to determine whether the rooms were easily breachable, i.e., whether the classroom doors were indeed unlocked. Chief Arredondo's protracted search for a master key, despite his position as the police chief of the entirety of CISD's campuses, consumed his attention thereby delaying the otherwise required rapid neutralization of the shooter. Neither Arredondo or any law enforcement asked the school's

principal, Maddy Gutierrez or the head custodian for a master key despite such being in their possession.

131.    Such oversight encapsulated the entirety of law enforcement's response as there was a vacuum of communications, both literally as radio and cell service within the building was purportedly non-existent and figuratively as there existed no incident command to serve as a conduit for communicating between the various responding parties and locations on the campus.

### 4.  DPS and Governor Disseminate an Exaggerated Account of Law Enforcement's Response

132.    In an attempt to obfuscate and camouflage the complete and utter disarray of law enforcement's response, the initial public statements and press briefings provided by the DPS intentionally painted an inaccurate and exaggeratedly positive picture of law enforcement's response. DPS Regional Director Victor Escalon's briefing provided the information that Texas Governor Greg Abbott relied upon in his press conference the day after the massacre. Governor Abbott repeated a false narrative that the entire incident only lasted as little as forty minutes and praise was due to the officers who rapidly devised a plan, stacked up, and neutralized Ramos. Thus, the Governor presented a false narrative that law enforcement conducted a seamless mission keeping Ramos pinned down while children were being carefully evacuated.

### 5.  Expression of Emotional and Physical Trauma Plague Plaintiffs and Class Members

133.    On account of the preposterous length of time that it took Defendant law enforcement to finally neutralize Ramos and liberate the students, the amount and degree of trauma, distress, and life shattering anxiety that Plaintiffs and class members incurred had exponentially increased with each moment that Defendants refused to affirmatively act. Defendants conduct significantly prolonged the time that Plaintiffs were required to assume lockdown conditions and

on account thereof, the resulting emotional and physical scaring incurred by Plaintiffs had been significantly and exponentially increased.

134.    For example, **Student Class Representative J.P.,** who, after watching his beloved teacher Ms. Avila endure close to seventy minutes of agony responding to a gunshot to her abdomen and his friend attend to her bloodied and severed nose, has refused to either leave his house or his parents side since the shooting incident. J.P. obsessively draws the window blinds to his house and repeatedly locks its doors and sleeps in his parent's room.

135.    Although the expressions vary, such emotional and physical manifestations have rampantly expressed themselves throughout the daily lives of each Plaintiff and class member, significantly plaguing and obsessing them, as well as the entirety of the Uvalde community

## CLASS ALLEGATIONS

136.    Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action as a class action on behalf of themselves and all other similarly situated (1) students, teachers and support staff who were located within the perimeter of Robb Elementary school's campus on May 24, 2022 and (2) the students' parents regardless of their location on May 24, 2022. The danger posed to the lives, health, and safety of these class plaintiffs was exponentially increased on account of Defendants' affirmative conduct in refusing and failing to comply with mandated state and CISD protocols for protecting against and responding to the active shooting that occurred at Robb Elementary on May 24, 2022. Plaintiffs reserve the right to amend these putative class definitions as discovery or other case circumstances may warrant.

137.    Alternatively, to the extent that the Court should find that a class is unavailable, Plaintiffs reserve the right to designate their action as a mass action pursuant to the requirements of 28 U.S.C. § 1332(d).

138.   Class certification is appropriate because the class sought to be certified is more than sufficiently numerous to make joinder impractical. The number of members in the putative Class is great, but not so great as to make the class unmanageable. It is therefore impractical to join each Class member as a named plaintiff. While the exact number of Class members is not yet known, there are a significant number of similarly situated students, teachers, school support staff, and parents such that utilization of a class action is the most economically feasible means of litigating the merits of this action.

139.   Class certification is appropriate because Plaintiffs and their counsel are adequate class representatives. Like all members they seek to represent, Class Representative Plaintiffs were located on the Robb Elementary campus(or with respect to Parents class members had children on campus) on May 24, 2022 between the prescribed hours; and on account of Defendants conduct constituting deliberate indifference reflected in their affirmative conduct and disregard of their mandated protocols for both protecting against and responding to the active shooter, caused and exacerbated the debilitating harms that they will have have to endure for the balance of their lives. Plaintiffs' counsel is experienced in class action litigation, including having engaged in previous class-wide litigation and will therefore more than adequately represent the interests of putative class members.

140.   Class certification is appropriate because Plaintiffs' action raises common questions of fact or law, whose means of proof predominates over questions that may call for individual adjudication. Among these predominating common questions of fact or law are, but not limited to:

(a)   Whether municipal Defendants, through the conduct of their final policymakers, undertook a custom and practice of failing to comply with state and district standards and protocols for protecting against and responding to an active shooter

43

at Robb Elementary on May 24, 2022 and whether such practice was undertaken with deliberate indifference to Plaintiffs' health and safety by creating and/or increasing the threat-of and danger-to Plaintiffs;

(b)    Whether individual Defendants, by affirmatively acting in contravention to state and district standards and protocols for protecting against and responding to an active shooter, were deliberately indifferent to Plaintiffs' health and safety by creating and/or increasing the threat-of and danger-to Plaintiffs.

141.    Class certification is appropriate because Plaintiffs' claims are typical of the claims asserted on behalf of the putative class members. All claims asserted by Plaintiffs are also asserted on behalf of all class members, and there are no conflicts of interest that render Plaintiffs' claims or interests atypical of the claims or interests of the class members. Each class member has suffered the same type of damages and have incurred similar actual damages on account of Defendants' deliberate indifference and are of a similar type and amount to the actual damages suffered by each class member.

142.    Class certification is appropriate because class-wide adjudication of the claims alleged by Plaintiffs is superior to separate adjudication by individual class members, which may yield conflicting results, judgments, and obligations. In accordance with Fed.R.Civ.P. Rule 23(b)(2), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

143.    Also in accordance with Fed. R. Civ. P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties.

144.    Further, the costs of litigating this action against municipal and state actors renders individual litigation impractical and unfeasible, thereby rendering class-wide adjudication a superior means of resolving the claims alleged in this Class Action Complaint.

145.    Lastly, class certification is most appropriate because Defendants have acted in a manner where injunctive and/or declaratory relief would be instrumental in precluding future harm as it impacts the class as a whole.

**FIRST CAUSE OF ACTION**
**42 U.S.C. § 1983**
**MUNICIPAL LIABILITY**

*(All Plaintiffs and Class Members against the Uvalde Consolidated Independent*
*School District & City of Uvalde)*

146.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

147.    Section 42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party. A municipality is a "person" subject to liability under Section 1983 for violating an individual's constitutional rights on account of an official and/or unofficial policy and custom.

**Uvalde Consolidated Independent School District**

148.    Municipal liability attaches to Uvalde's Consolidated Independent School District (CISD) on account of its custom and practice of failing to ensure its police department's compliance with its own, as well as the City of Uvalde and State of Texas' rules, regulations and protocols ensuring the safety and protection of its students and staff in the event of an active shooter incident occurring on its school campuses.

45

149.     Upon information and belief, the CISD's school board had provided the Chief of CISD's police department, Pedro Arredondo with final policymaking over safety and law enforcement matters, including the assurance that CISD's campuses are compliant with its own, as well as the City of Uvalde and State of Texas rules, regulations and protocols that provide for the safety of CISD's students and staff.

150.     In summarizing the exhaustive accounting above, the following security infirmities and safety infractions in violation of both the ALERTT and Annex 1 protocols existed at Robb Elementary school on or before May 24, 2022: (1) substandard and easily breachable perimeter fencing; (2) complete lack of enforcement over mandated requirements that both exterior and interior doors are to be locked at all times and exist in an operable state of repair; (3) interference of the campuses' emergency warning system on account of poor internet and cellphone service; and (4) the failure to amend the School's Raptor lockdown alert system in order to account for the inordinate frequency of 'false alerts' broadcasted on account of the school's proximity to the Mexican border.

151.     Upon information and belief, the CISD school board was apprised of the above security infirmities and infractions occurring at Robb Elementary but failed to take any affirmative action to remediate the school's noncompliance with its own and State mandated safety protocols for protecting against and responding to an active shooter on campus.

152.     On account of its custom and practice of permitting noncompliance with the required rules, regulations and protocols enacted to ensure the safety of plaintiffs and class members in the event of an active shooter scenario, Defendant CISD, through the deliberate indifference of its final policymaker, CISD Chief of Police Arredondo and chief administrator, Principal Gutierrez, violated Plaintiffs' Fourteenth Amendment rights to bodily and emotional

integrity, as well as parental rights to make decisions regarding their children's care, custody and control.

153.    By affirmatively disregarding the state of noncompliance with the required protocols for campus preparedness to protect against and respond to an active shooter at Robb Elementary, CISD final policymaker Chief Arredondo and CISD Principal Gutierrez "used their authority to create a dangerous environment for plaintiffs" by "consciously disregarding a known and excessive risk of harm," in violation of Plaintiffs' Fourteenth Amendment rights.

154.    On account of such conduct, CISD has caused Plaintiffs and class members unspeakable and lifelong physical, emotional, and societal harm.

155.    School District liability also attaches for violation of Plaintiffs and class members aforementioned Fourteenth Amendment rights on account Defendant CISD Chief of Police Arredondo's failure as the District's final policymaker, to comply with CISD and State protocols required when responding to the active shooter incident that unfolded over the agonizing seventy-seven minute period at Robb Elementary on May 24, 2022.

156.    By failing to take both affirmative action in compliance with said protocols, as well as affirmatively inhibiting action to take place, Defendant Chief Arredondo, as CISD's final policymaker for safety on CISD properties, displayed a "deliberate indifference" to Plaintiff and class members' Fourteenth Amendment rights to bodily integrity, emotional wellbeing and parental rights to the care, custody and control of their children.

**City of Uvalde**

157.    City of Uvalde's liability exists on account of the Uvalde's law enforcement's final policymaker's deliberate indifference to Plaintiffs and Class members' 14th Amendment rights to bodily integrity, emotional wellbeing and parental rights to the care, custody, and control of their

children by failing to take affirmative action to comply with the District and State's required active shooter protocols and policies. Upon information and belief, the City of Uvalde's City Council had provided the Chief of Uvalde's police department with final policymaking authority to ensure that the City of Uvalde was not only compliant with the State's mandated active duty training protocols, but that such protocols would be dutifully executed in the event of an active shooter within the jurisdiction of the city of Uvalde.

158.    On May 24, 2022, Lt. Mariano Pargas was the acting Uvalde police chief who was on the scene at Robb Elementary and as Uvalde's final policymaker, was charged with complying with the Uvalde's and the State of Texas' protocols for responding to the unfolding active shooter at Robb Elementary. Acting Chief Pargas undertook his supervisory decisionmaking authority by making a deliberate choice to follow a course of action "made from among various alternatives…," including ordering his subordinates to stand down and delay the expeditious neutralization of Ramos. Acting Chief Pargas' choices and decisions were rendered in a manner that was deliberately indifferent to Plaintiffs' and class members rights to bodily integrity, emotional wellbeing and parental rights to the care, custody, and control of their children.

159.    Lastly, a municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where the "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference."

160.    Here, on account that both the ALERTT and Annex protocols for responding to an active shooter mandates immediate action to neutralize the shooter, even at the risk of the respondents' life, UCISD-PD and UPD officers magnificently failed to follow this nonnegotiable prescriptive protocol. Such nonfeasance is understandable given that reports indicate that the

District and the City of Uvalde failed in fact to provide training to half of its respective police force despite again, the State's mandatory requirement that all district police officers undergo active shooter training.

161.    Additionally, although the ALERTT and Annex protocols unconditionally require that the responding officers to immediately establish a command center to assist with communicating and coordinating the rapidly arriving emergency services, such mandated response was also patently disregarded by UCISD-PD and UPD officers, including most glaringly, Chief Arredondo and Acting Chief Pargas.

162.    Thus, given UCISD-PD and UPD's complete and utter failure to comply with their mandated requirements for responding to an active shooter, the inadequacy of their training was more than obvious and apparent. Although thankfully there hadn't been a prior active shooting incident within the school district, UCISD-PD and UPD's utterly reprehensible response fully satisfies a showing of deliberate indifference such that this single incident fully supports Plaintiffs' claim for failure to train.

163.    On account of the acts and omission of Defendants' CISD and the City of Uvalde's final policymakers' resulting in the violation of Plaintiffs and Class members' Fourteenth Amendment rights, Defendants municipalities were the direct ad proximate cause of Plaintiffs' and injuries and damages, including, but not limited to the following: post-traumatic stress disorder, fright, shock, and terror; pain and suffering; anxiety; mental anguish; emotional distress; fright and shock; mortification; past and future reasonable medical, psychological and hospital expenses; past and future wage loss and loss of earnings capacity; need for household services; need for attendant care; exemplary damages; Any and all compensatory damages, both past and future; attorneys' fees and costs; other damages, injuries, and consequences that are found to be related to the

incident that develops during the course of discovery; and Any other damages permitted by Federal and Texas law.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
### Liability for Violation of Plaintiffs' Substantive Due Process Rights under Fourteenth Amendment

(*All Plaintiff & Class Members against Defendants Maddy Gutierrez, Pedro Arredondo, Adrian Gonzalez, Jesus Suarez, Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Victor Escalon, Steve McGraw, Joel Betancourt, Juan Maldonado*)

164.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

165.    42 U.S.C. § 1983 provides that every "person" who, under color of any statute, ordinance, regulation, custom, or usage of any State subjects, or "causes to be subjected," any person to the deprivation of any federally protected rights, privileges, or immunities shall be civilly liable to the injured party.

166.    The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV, § 1. To state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs must show that they have asserted a recognized liberty interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest under color of state law. The Fourteenth Amendment protects against the government's interference with 'an individual's bodily integrity and protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children.

167.    While the Fourteenth Amendment's right to bodily integrity and parental rights do not ordinarily extend to circumstances when harm is incurred at the hands of a private actor, where however, a state actor's acts with deliberate indifference to a person's plight and creates a more

dangerous circumstance, a person's Fourteenth Amendment rights attach and the state actor is amenable to liability. A viable "state-created danger" claim requires the State to take an affirmative step to create the danger or make the plaintiff more vulnerable to it.

168.    Here, Defendants' Maddy Gutierrez, Pedro Arredondo, Adrian Gonzalez, Jesus Suarez, Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Victor Escalon, Steve McGraw, Joel Betancourt, Juan Maldonado were performing under the color of state law and as such, are being sued in their individual capacities. But for SPD Director McGraw, the above designated Defendants were on site at Robb Elementary on May 24, 2022 and thereby, upon their own volition, directly acted and/or ordered their subordinates to act, in complete contravention of the required standards and protocols for responding to an active shooter.

169.    As the above statement of facts exhaustively makes plain, each of the above named Defendants acted in manner that was deliberately indifferent to Plaintiffs' safety and wellbeing in that their conduct considerably heightened the danger that Plaintiffs faced on account of Defendants failure to implement the required active shooter protocols in the expeditious fashion that they were otherwise mandated.

170.    Primarily, the danger faced by Plaintiffs and class members were significantly enhanced by Defendant Principal Gutierrez and Chief Arredondo who, despite being well aware that the security systems in place at Robb Elementary were severely compromised, consciously disregarded such fact and on account of such, provided Ramos easy access, both to (1) the perimeter of the campus on account of significantly low and breachable perimeter fences, and (2) the school building and classrooms on account of a pattern and practice of permitting the external doors to be unlocked and the internal classroom doors to be broken and unlockable. Similarly,

Gutierrez and Arredondo's failed to rectify the consistently unreliable internet service on campus which inhibited the school's Raptor alert system, as well as reliable police radio communications and/or cell phone use.

171.    Such circumstance came to pass on the morning of May 24, 2022 where the faulty cell service inhibited a prompt emergency message to disseminate to teachers and staff resulting in a delayed response to Ramos's presence on campus. Such failure to warn significantly heightened the danger posed to plaintiff students, including those on the playing fields who were forced to confront Ramos directly by having to scurry inside the school building, as well as those in the building who were forced to frantically assume lockdown positions within unlocked classrooms.

172.    The above dereliction of Gutierrez and Arredondo's duties to ensure that Robb Elementary was in compliance with the state mandated active shooter ALERTT requirements more than created and exacerbated dangerous conditions at Robb Elementary and on account of their knowledge and disregard, evinced their deliberate indifference to a known and excessive risk to Plaintiffs' safety.

173.    Secondly, the danger faced by Plaintiffs and class members were significantly enhanced by the above designated law enforcement Defendants' conduct on May 24, 2022, where said defendants' were well apprised of the continuing danger that Plaintiffs faced yet intentionally disregarded compliance with the state mandated protocols to take swift and affirmative steps to "isolate, distract and neutralize" Ramos.

174.    Rather than appropriately order their particular law enforcement agencies to undertake this mandatory directive, Defendants' Arredondo, Pargas, Escalon, and McGraw disregarded such directive but instead deferred to each-others agencies where it was blatantly

obvious that no agency in particular was taking charge. Defendant Arredondo had barricaded himself within the school's south hallway flatly ignoring his mandatory responsibility to serve as the incident commander and establish and coordinate a unified response amongst the various responding law enforcement agencies. Similarly, Chief Arredondo commanded the UCISD officers in his vicinity to stand down and refrain from confronting Ramos

175.    Thus, given the lack of radio and internet services within the building, Chief Arredondo was unable to either receive or send communications such that he was out of touch with the efforts that were being undertaken on the north side of the building that was commandeered by Uvalde PD and its acting Chief Pargas. Despite being the first responders into the building mere seconds after Ramos slaughtered the students and teacher in Room 111, Defendants UPD and UCISD officers, Arredondo, Gonzalez, Suarez, Pargas, Canales, Martinez, and Coronado, Louis Landry, Donald Page, Justin Mendoza, and Juan Maldonado refrained from swiftly confronting Ramos. Thereafter, despite perceiving the necessity to initiate an incident command on account of Chief Arredondo's refusal to assume his required role, Uvalde PD Acting Chief Pargas both failed to assume that role as well as affirmatively instructed his Uvalde PD officers to stand down and not expeditiously confront Ramos.

176.    This same affirmative command to indiscriminately violate state active shooter protocol by "standing down" and refraining from actively confronting Ramos was perpetuated by DPS under the leadership of Regional Director Escalon and Director McGraw. Despite the more jurisdictionally superior, well equipped, experienced, and by the far, the most represented law enforcement agency on the campus (ninety-one DPS officers on site), Regional Director Escalon disseminated the order throughout DPS ranks that DPS involvement should be limited to perimeter control. DPS Captain Betancourt's unequivocal 'stand down' order more than affirms such

directive. Similarly, and in alignment with DPS's decision to relegate its participation to a supportive rather than a leadership role, Director Escalon and his subordinates refrained from filling the glaringly apparent vacuum of incident command despite that such decision was in direct violation of the required ALERTT protocols.

177.    Thus, Defendants' Arredondo, Pargas, Escalon, and McGraw ("Supervisory Defendants") took decisive, affirmative steps to exacerbate and prolong the danger posed to Plaintiffs and class members by permitting an active shooter to remain inside Room 111 for an excruciatingly unreasonable period of time when Defendants knew that (1) there were students within the same room who had been murdered and/or injured and in need of prompt medical assistance and (2) Ramos was armed with significant firepower that could penetrate the surrounding hallways and classrooms where Plaintiffs and class members were locked down. Thus, Supervisory Defendants' incorrigible procrastination and lack of coordinated response heightened the risk of danger and protracted harm that manifested in Plaintiffs incurring crippling and life shattering fear and dread, particularly by those class members locked in Room 111 surrounded by their mutilated and dying friends.

178.    As Supervisory Defendants were in charge of law enforcement agencies who were in complete control over both the scope and timing of their response to the active shooter on May 24, 2022, the unreasonable hesitation with which they proceeded greatly enhanced the dangerousness with which Plaintiffs were forced to face and endure. In making their decisions on how to proceed, it is clear that they raised their own safety above and beyond Plaintiffs.

179.    Defendants' conduct reasonably reflected a deliberate indifference to the Fourteenth Amendment rights of the named Plaintiffs and class members by placing them in a state of danger that grew more dangerous with each passing moment as those already injured were

torturously dying and those in lock down were torturously incurring physical and emotional trauma that will plague them for the balance of the many years left of their future.

**Special Relationship**

180.   A violation of substantive due process is additionally triggered where a state actor affirmatively acts to restrain an individual's freedom to act on their own behalf, i.e., a restraint on an individual's personal liberty such that they are in the State's custody and control that otherwise evokes a 'special relationship' as the individuals are unable to care for themselves.

181.   Here, by effectuating a perimeter that resulted in barricading Plaintiffs students, teachers, and support staff inside their particular classrooms, offices, and other spaces within Robb Elementary's campus, the above named law enforcement Defendants had an affirmative duty to provide for Plaintiffs' safety and protection on account of establishing a 'special relationship' with said Plaintiffs. By effectively cutting off private avenues of lifesaving rescue and failing to come to Plaintiffs students, teachers, and support staffs' aid for seventy-seven minutes, Plaintiffs substantive due process rights to bodily and emotional integrity were exceedingly violated.

182.   Similarly, the rights of Plaintiff Parents to make decisions regarding their children's care, custody and control were violated as law enforcement Defendants' forcefully prevented their access onto the campus in order to exercise their substantive parental rights which were severely and utterly compromised. Thus, on account of fully taking charge over the children's safety and well-being while affirmatively rebuffing the parents attempt to undertake their own rescue measures, Defendants, in creating a special relationship, had emphatically failed to provide for the children's safety, despite having the affirmative duty to do so. Thus, Defendants seventy-seven minute reluctance to liberate Plaintiffs, while effectively rebuffing and preventing others,

including Plaintiff children's parents, from coming to their aid, Defendants most significantly violated Plaintiffs' substantive due process rights to bodily and emotional integrity.

183.   On account of their acts and omissions resulting in the violation of Plaintiffs and Class members' Fourteenth Amendment rights, Defendants' were the direct ad proximate cause of Plaintiffs' and injuries and damages, including, but not limited to the following: post-traumatic stress disorder, fright, shock, and terror; pain and suffering; anxiety; mental anguish; emotional distress; fright and shock; mortification; past and future reasonable medical, psychological and hospital expenses; past and future wage loss and loss of earnings capacity; need for household services; need for attendant care; exemplary damages; any and all compensatory damages, both past and future; attorneys' fees and costs; other damages, injuries, and consequences that are found to be related to the incident that develops during the course of discovery; and Any other damages permitted by Federal and Texas law.

**WHEREFORE,** the named Plaintiffs and class members they seek to represent pray that the Court will:

a)   Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

b)   Issue a class-wide judgment declaring that Defendants' Uvalde CISD and the City of Uvalde's policy, practice and custom of failing to undertake and comply with the state mandated and district required protocols and standards for protecting against and responding to an active shooter violated Plaintiffs and class members Fourteenth Amendment rights to the United States Constitution;

c)   Issue an order for the following injunctive relief:

   i)   enjoining the CISD and City of Uvalde from continuing its policy and custom of noncompliance with the district and state's mandated protocols and standards for protecting against an active shooter scenario

   ii)   requiring the CISD and City of Uvalde to institute and implement improved

policies, programs, training and infrastructure with respect to proactively educating, preventing, discovering, and responding to young adults who display a propensity to engage in mass shooting;

iii) requiring the CISD and City of Uvalde to institute and implement appropriate measures to ensure compliance with City, State and Federal directives pertaining to responding to active shooter scenarios, as well as other emergencies at schools or other institutions involving children and youth;

iv) requiring the school principals and other supervisory staff on all CISD campuses to undertake mandatory training in preventing and responding to active shooter scenarios, as well as provide training to all teaching and support staff in how to detect and respond to students who display a potential for engaging in mass violence on campus;

d) Award named Plaintiffs and class members' damages in amount of Twenty-Seven Billion Dollars ($27,000,000,000);

e) Plaintiffs and class members against Defendants' Maddy Gutierrez, Pedro Arredondo, Adrian Gonzalez, Jesus Suarez,  Mariano Pargas, Eduardo Canales, Javier Martinez, Daniel Coronado, Louis Landry, Donald Page, Justin Mendoza, Victor Escalon, Steve McGraw, Joel Betancourt, Juan Maldonado, Chief Arredondo, Principal Gutierrez, to the extent that their liability is based upon reprehensible actions and/or inaction undertaken in their individual capacities, Punitive Damages in an amount which is fair, just and reasonably designed to punish and deter said reprehensible conduct, to be determined at trial;

f) Award all Plaintiffs, including the members of the class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

g) Award all Plaintiffs, including the members of the class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

h) Award such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated:  November 29, 2022                **Respectfully Submitted,**

                                         */s/Charles A. Bonner*

**RYDER LAW FIRM**                       **LAW OFFICES OF BONNER & BONNER**
JESSE RYDER (pro hac forthcoming)        CHARLES A. BONNER
6739 Myers Road                          CABRAL BONNER
E. Syracuse, NY 13057                    ERIC SEIFERT (Pro hac forthcoming)
Tel: (515) 382-3617                       475 Gate Five Rd., Suite 211
e-mail: ryderlawfirm@gmail.com           Sausalito, Ca 94965
                                         Tel: (415) 331-3070
**EVANS LAW OFFICE P.P.L.C.**            Fax: (415) 331-2738
JERRY EVANS                              e-mail: cbonner799@aol.com
127 N. West Street                       e-mail: cabral@bonnerlaw.come-mail
Uvalde, Texas 78801                      e-mail: eseifert00@hotmail.com
Tel: (830) 900-5021
e-mail: devanslawoffice@gmail.com

**THE BONNER LAW FIRM, P.C**.            **WINSTEAD P.C.**
VICTOR BONNER (pro hac forthcoming)      JOSE ANGEL GUTIERREZ, JUDGE RET.
4820 Old Spanish Trail                   2778 N. Harwood St. St. 500
Houston, Texas 77021                     Dallas, Texas 75201
Tel: (832) 433-6565                      Tel: 214-745-5400
e-mail: vicbonneresq@gmail.com           e-mail: joseangelgutierrez@yahoo.com

**JOHNSON TRIAL LAW**
JAMES M. JOHNSTON, ESQ. (pro hac forthcoming)
100 WILSHIRE BLVD. SUITE 700
SANTA MONICA, CA 90401
TEL: (424)-272-6680
e-mail: james@johnsontrial.com